UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS COURTHOUSE

| | |
|---|---|
| Patricia Smith, individually and on behalf of all others similarly situated, | 7:22-cv-10836 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Bed Bath & Beyond Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. Bed Bath & Beyond Inc. ("Defendant") manufactures, markets, labels and/or sells pain relief patches promising to deliver 4% lidocaine under the Core Values brand ("Product").



2. Lidocaine is a topical anesthetic used to treat pain by blocking the transmission of pain signals from nerve endings in the skin to the spinal cord and brain.

3. Relevant front label representations include "Maximum Strength," "Pain Relief Lidocaine Patch," "Lidocaine 4%," "Desensitizes aggravated nerves and relieves pain," by providing "Targeted pain relief" for "Use on neck, back, shoulders, elbows and knees" in a "Stay-put flexible patch" that is "Easy to apply & remove" which "Lasts up to 12 hours," shown through an image of the Product applied to the lower back.

## I. PRODUCT FAILS TO DELIVER LIDOCAINE IN PROMISED WAY

4. In 2003, the Food and Drug Administration ("FDA") reviewed over-the-counter ("OTC") skin patches to determine their safe and effective concentration of lidocaine.

5. The FDA concluded that these transdermal drug delivery systems systematically fail to adhere to the body.

6. Since adequate adhesion is critical for effectiveness, patches which lift or detach while walking, sleeping or exercising will compromise dosing.

7. The FDA Adverse Events Reporting System revealed that approximately 70% of consumer complaints about such products relate to their poor adhesion.

8. A 2021 peer-reviewed study in the Journal of Pain Research found that none of the generic lidocaine patches it evaluated fully adhered to a subject's skin after twelve hours.

9. This was significant, because the study required participants were sedentary while the patches were applied.

10. Although the study tested generic patches, the Product uses that same adhesion technology and has not undergone the rigorous FDA approval process.

11. When consumers see the promise of "up to 12 hours" of relief through the use of the

"stay-put flexible patch" that "desensitizes aggravated nerves and relieves pain," with "targeted pain relief" to their "neck, back, shoulders, elbows and knees," they expect the Product will adhere to their bodies for no less than twelve hours, or at least approach that length of time.

12. The Directions on the back panel Drug Facts confirm the Product will adhere for twelve hours because it instructs to "Use one patch for up to 12 hours."

> **Directions**
> Adults and children 12 years of age and over: Clean and dry affected area. Carefully remove backing from patch starting at a corner. Apply sticky side of patch to affected area. Use one patch for up to 12 hours. Discard patch after single use. Children under 12 years of age: consult a physician.

13. However, the Product cannot adhere for twelve hours, which renders the Directions misleading, because it assumes it will not have detached by then.

14. Studies have shown the Product is unable to adhere to the skin for more than four hours, often peeling off within minutes of light activity, which renders the "Lasts up to 12 hours" misleading, because this is a significant disparity between what is promised and what is delivered.

## II. MAXIMUM STRENGTH CLAIM IS MISLEADING

15. The representation of "Maximum Strength" is misleading for multiple reasons.

16. First, this tells consumers the Product contains and delivers the maximum amount of lidocaine available in patch form and is superior or equivalent in efficacy and results to other OTC and prescription-strength lidocaine patches.

17. However, newly developed adhesive technology delivers the bioequivalence of 5% lidocaine in patch form and maintains adhesion for at least twelve hours under normal conditions.

18. Second, numerous studies and reports revealed that users of adhesive lidocaine patches using the same technology used by the Product regularly peel off a user's skin within three to four hours, and sometimes minutes, after being applied.

19. Since, according to the FDA, the actual strength of a lidocaine patch is measured by

3

the "mass of drug relative to the mass of the adhesive per patch" delivered to the target area, these adhesion deficiencies cause the delivery and absorption of lidocaine via the Product to be greatly reduced.

20. This inability to adhere for anywhere close to twelve hours means the Product cannot deliver the "Maximum Strength" amount of lidocaine.

## III. DESENSITIZING CLAIMS

21. Based on its research and studies of consumer understanding, the FDA concluded that statements about desensitizing nerves and numbing pain were misleading in the context of transdermal patch delivery systems.

22. This was based on its finding that consumers associate such statements with medical treatments requiring a prescription and FDA approval.

23. By promoting the Product's ability to "Desensitize[] aggravated nerves," consumers including Plaintiff expected it would completely block and numb nerves and pain receptors, eliminate responses to painful stimuli, and treat neuropathic and musculoskeletal pain, including back and spinal pain.

24. However, the Product is not capable of providing the expected results, is available without a prescription and has not been approved by the FDA.

25. The front label promise to "Desensitize[] aggravated nerves" is inconsistent and contradictory with the Product's limited approval to "Temporary relieve[] minor pain," indicated in the Drug Facts on the back panel.

> **Use** Temporarily relieves minor pain.

## IV. CONCLUSION

26. Defendant makes other representations and omissions with respect to the Product

which are false and misleading.

27. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $5.99 per box of five patches, excluding tax and sales, higher than similar Product, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

### Jurisdiction and Venue

28. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

29. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

30. Plaintiff is a citizen of New York.

31. Defendant is a New York corporation with a principal place of business in New Jersey.

32. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

33. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here for several years, in dozens of locations, including Defendant's Harmon and Bed Bath & Beyond stores and online in the States covered by Plaintiff's proposed classes.

34. Venue is in this District with assignment to the White Plains Courthouse because a substantial part of the events or omissions giving rise to these claims occurred in Orange County, including Plaintiff's purchase and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

35. Plaintiff Patricia Smith is a citizen of Newburgh, New York, Orange County.

36. Defendant Bed Bath & Beyond Inc. is a New York corporation with a principal place of business in Union, New Jersey, Union County.

37. Defendant operates chains of specialty superstores including Bed Bath & Beyond, Harmon (Face Values), and buybuy BABY.

38. While Defendant's stores sell leading national brands, they also sell a large number of OTC products under one of their private label brands, Core Values.

39. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

40. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

41. Products under the Core Values brand have an industry-wide reputation for quality and value.

42. In releasing products under the Core Values brand, Defendant's foremost criteria was high-quality equal to or better than the national brands.

43. Defendant was and is able to get national brands to produce its private label items due its loyal customer base, history of high-quality items and tough negotiating.

44. That Core Values branded products met this high bar was proven by focus groups, which rated them above the name brand equivalents.

45. Private label products generate higher profits because national brands spend significantly more on marketing, contributing to their higher prices.

46. A survey by The Nielsen Co. "found nearly three out of four American consumers

believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

47. Private label products under the Core Values brand benefit by their association with consumers' appreciation and awareness of Defendant's brands, including the Bed Bath & Beyond brand, as a whole.

48. The development of private label items is a growth area for Defendant, as it selects only top suppliers to develop and produce Core Values products.

49. Plaintiff purchased the Product at locations including Bed Bath & Beyond, 1399 NY-300, Newburgh, NY 12550, between June 2020 and December 2022, among other times.

50. Plaintiff purchased the Product to provide pain relief to her neck, back, shoulders, elbows and knees.

51. Plaintiff saw the Product was labeled and marketed as "Maximum Strength" and capable of delivering 4% lidocaine for "up to 12 Hours," would "Desensitize[] aggravated nerves and relieve[] pain" and provide at least temporary relief to the areas indicated.

52. Plaintiff believed and expected the Product (1) would adhere to her body to deliver 4% lidocaine for not less than twelve hours and not a significant amount of time less than this, (2) was the maximum strength available and (3) would deliver pain relief through desensitizing aggravated nerves, because that is what the representations and omissions said and implied.

53. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

54. However, the Product did not reliably adhere to Plaintiff's body for anywhere close to twelve hours, which prevented it from providing even temporary pain relief.

55. Plaintiff bought the Product at or exceeding the above-referenced price.

56. Plaintiff paid more for the Product than she would have had she known the representations and omissions were false and misleading, or would not have purchased it.

57. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

58. Plaintiff chose between Defendant's Product and similarly represented yet truthful products which did not misrepresent their attributes, features, and/or components.

## Class Allegations

59. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of North Carolina, Oklahoma, Wyoming, Virginia, Idaho, Arizona, Louisiana, Mississippi, Arkansas, Texas and Iowa who purchased the Product during the statutes of limitations for each cause of action alleged.

60. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

61. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

62. Plaintiff is an adequate representative because her interests do not conflict with other members.

63. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

64. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

65. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

### New York General Business Law ("GBL") §§ 349 and 350

66. Plaintiff incorporates by reference all preceding paragraphs.

67. Plaintiff believed the Product would reliably adhere to her body for no less than the time indicated on the label and not a significant amount of time less and provide a continuous dose of the maximum strength of lidocaine to desensitize her nerves and numb her pain.

68. Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

69. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Violation of State Consumer Fraud Acts
### (Consumer Fraud Multi-State Class)

70. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

71. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

72. Defendant intended that members of the Consumer Fraud Multi-State Class would

rely upon its deceptive conduct, which they did, suffering damages.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

73. The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff that it would reliably adhere to her body for no less than the time indicated on the label and not a significant amount of time less and provide a continuous dose of the maximum strength of lidocaine to desensitize her nerves and numb her pain.

74. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions, and targeted digital advertising.

75. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

76. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant it would reliably adhere to her body for no less than the time indicated on the label and not a significant amount of time less and provide a continuous dose of the maximum strength of lidocaine to desensitize her nerves and numb her pain.

77. Defendant's representations affirmed and promised that the Product would reliably adhere to her body for no less than the time indicated on the label and not a significant amount of time less and provide a continuous dose of the maximum strength of lidocaine to desensitize her nerves and numb her pain.

78. Defendant described the Product so Plaintiff believed it would reliably adhere to her

body for no less than the time indicated on the label and not a significant amount of time less and provide a continuous dose of the maximum strength of lidocaine to desensitize her nerves and numb her pain, which became part of the basis of the bargain that it would conform to its affirmations and promises.

79. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

80. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high-quality Core Values brand.

81. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

82. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties.

83. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

84. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

85. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it would reliably adhere to her body for no less than the time indicated on the label and not a significant amount of time less and provide a continuous dose of the maximum strength of lidocaine to desensitize her nerves and numb her pain.

86. The Product was not merchantable because Defendant had reason to know the

particular purpose for which it was bought by Plaintiff, because she expected it would reliably adhere to her body for no less than the time indicated on the label and not a significant amount of time less and provide a continuous dose of the maximum strength of lidocaine to desensitize her nerves and numb her pain, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

### Fraud

87. Defendant misrepresented and/or omitted the attributes and qualities of the Product because it did not and could not adhere for anywhere close to the hours promised, rendering its claims of "Maximum Strength" by "Desensitiz[ing] aggravated nerves" false and misleading.

88. Defendant is one of the world's largest sellers of consumer packaged goods, with immense resources and the ability to ensure the products it sold were represented truthfully, yet willingly failed to do so.

### Unjust Enrichment

89. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

  **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary, statutory and/or punitive damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated: December 22, 2022

                                               Respectfully submitted,

                                               /s/Spencer Sheehan
                                               Sheehan & Associates, P.C.
                                               60 Cuttermill Rd Ste 412
                                               Great Neck NY 11021
                                               (516) 268-7080
                                               spencer@spencersheehan.com